**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PERVAIZ A. CHAUDHRY, M.D.;
VALLEY CARDIAC SURGERY
MEDICAL GROUP,
            *Plaintiffs-Appellants,*

   v.

TOMÁS ARAGÓN[*], in his official
capacity as the Director of California
Department of Public Health;
STEVEN LOPEZ, California
Department of Public Health, Fresno
District Office Manager, in his official
and personal capacity; SHIRLEY
CAMPBELL, in her personal capacity,
            *Defendants-Appellees.*

No. 21-16873

D.C. No.
1:16-cv-01243-
SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Stanley A. Boone, Magistrate Judge, Presiding

Argued and Submitted March 7, 2023
San Francisco, California

---

[*] Tomás Aragón has been substituted for his predecessor, Sonia Angell, under Fed. R. App. P. 43(c)(2).

Filed May 23, 2023

Before:  Michelle T. Friedland and Ryan D. Nelson, Circuit Judges, and Gary S. Katzmann,[**] Judge.

Opinion by Judge Katzmann

## SUMMARY[***]

### Civil Rights

The panel affirmed the district court's dismissal, following a five-day bench trial, of an action brought pursuant to 42 U.S.C. § 1983 against present or former employees of the California Department of Public Health alleging a "stigma-plus" due process claim on the grounds that defendants violated Dr. Chaudry's and Valley Cardiac Surgery Medical Group's Fourteenth Amendment rights by denying Dr. Chaudhry an opportunity to be heard before publishing a purportedly erroneous investigative report on an unsuccessful cardiac surgery.

Following an investigation of the surgery, the Department published on its website a combined Statement of Deficiencies and Plan of Correction.  The district court concluded, among other things, that plaintiffs Dr. Chaudhry and Valley Cardiac Surgery Medical Group failed to

---

[**] The Honorable Gary S. Katzmann, Judge for the United States Court of International Trade, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

establish the requisite causation element for a "stigma-plus" due process claim under § 1983. The district court assessed that it was the tragic events surrounding patient Silvino Perez's surgery and Dr. Chaudhry's violations of certain hospital policies—and not the ostensibly stigmatizing Statement of Deficiencies—that were the causes of plaintiffs' alleged deprivations.

The panel held that the district court's negative causation finding was plausible in light of record evidence establishing, *inter alia*: the timing and conclusions of the hospital's internal investigations; the independent actions of a hospital employee to alert the Perez family to potential malfeasance by Dr. Chaudhry; the Perez family and estate's pursuit of legal action; the accounts of key percipient witnesses to the Perez surgery as part of the Perez malpractice case; and the sizable malpractice judgment awarded against Dr. Chaudhry. The panel thus sustained the district court's determination that plaintiffs failed to prove that defendants' conduct was the actionable cause of the claimed injury and concluded that, at a minimum, plaintiffs failed to establish the requisite causation element of their "stigma-plus" due process claim under § 1983.

## COUNSEL

Thornton Davidson (argued), Thornton Davidson P.C., Fresno, California, for Plaintiffs-Appellants.

Diana Esquivel, Deputy Attorney General; Catherine Woodbridge, Supervising Deputy Attorney General; Danielle F. O'Bannon, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the

California Attorney General; Sacramento, California; for
Defendant-Appellees.

**OPINION**

KATZMANN, Judge:

Plaintiffs Dr. Pervaiz A. Chaudhry and Valley Cardiac
Surgery Medical Group bring suit under 42 U.S.C. § 1983
against Defendants Tomás Aragón, Shirley Campbell, and
Steven Lopez—each present or former employees of the
California Department of Public Health—on the grounds
that Defendants acted under color of state law to deprive
Plaintiffs of certain rights secured by the United States
Constitution. Specifically, Plaintiffs allege a "stigma-plus"
due process claim under § 1983 on the grounds that
Defendants violated their Fourteenth Amendment rights by
denying Dr. Chaudhry an opportunity to be heard before
publishing a purportedly erroneous investigative report on
an unsuccessful cardiac surgery. They contend that the
publication of this report caused Plaintiffs to be deprived of
protected employment-related interests. After a five-day
bench trial, the United States District Court for the Eastern
District of California concluded that Plaintiffs failed to
establish several necessary elements of their claim and, thus,
dismissed the action in its entirety; Plaintiffs challenge each
of the district court's negative elemental findings before this
court.

Because we conclude that, at a minimum, Plaintiffs
failed to establish the requisite causation element of their
"stigma-plus" due process claim under § 1983, we affirm the
district court's dismissal of Plaintiffs' action in its entirety.

# I. BACKGROUND

## A. Factual Background

Plaintiff Dr. Chaudhry was a cardiothoracic surgeon and a practitioner with substantial financial and leadership interests in Plaintiff Valley Cardiac Surgery Medical Group ("Valley Cardiac"). On April 2, 2012, Dr. Chaudhry performed open-heart surgery on patient Silvino Perez at Community Regional Medical Center ("the Hospital"), a private hospital in Fresno, California. The relevant individuals who were present in the operating room for the surgery were Dr. Chaudhry, Kalwant Dhillon, M.D. (assistant surgeon), Ashwin Bhatt, M.D. (anesthesiologist), Bella Albakova (physician assistant, or "PA"), and Aaron Schreur (perfusionist). The parties dispute whether Dr. Chaudhry left the operating room: (1) before the surgery was complete; (2) before Perez's chest had been closed and sutured; and/or (3) when Perez was unstable.

Soon after Dr. Chaudhry left, Perez experienced ventricular fibrillation and Dr. Chaudhry was called back to the hospital to attend to him. Despite intervention, Perez suffered hypoxic brain injury. On April 2, 2012—the same day as the Perez surgery—the Hospital began an internal investigation into the events of the operation and on April 12, the Hospital's Medical Executive Committee resolved to have the Perez case independently reviewed by an outside cardiovascular surgeon.

Meanwhile, on April 11, the California Department of Public Health ("CDPH")—a state agency—received an anonymous phone call alleging that Dr. Chaudhry left the operating room while Perez's chest was still open, and then left the hospital while his PA Albakova and assistant surgeon Dhillon finished the surgery. Because the California Health

and Safety Code requires onsite investigations if CDPH receives a written or oral complaint indicating "an ongoing threat of imminent danger of death or serious bodily harm," *see* Cal. Health & Safety Code § 1279.2(a)(1), CDPH initiated an investigation of the Hospital.

Accordingly, from around April 16 to 19, 2012, a surveyor for CDPH conducted the onsite investigation of the Hospital on behalf of the state. During his investigation, the surveyor did not interview Dr. Chaudhry, Dr. Dhillon, Dr. Bhatt, or PA Albakova. Defendant Steven Lopez—then a Health Facilities Evaluator Supervisor for CDPH—verified and supervised the state investigation.

CDPH, like many other state agencies, has an agreement with the federal government to conduct validation surveys of hospitals that participate in Medicare[1] and Medicaid[2] to ensure compliance with minimum health and safety standards. *See* 42 C.F.R. § 488.10(a)(1), (c). As part of these hospital surveys, CDPH surveyors document assessed violations, otherwise known as "deficiencies," which are ultimately presented to the surveyed facility in a "Statement of Deficiencies." 42 C.F.R. § 401.133(a). When CDPH conducts both state and federal investigations of a single

---

[1] Medicare is the U.S. federal health insurance program for adults over sixty-five and certain other people with disabilities. *See What's Medicare?*, Medicare.gov, https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/whats-medicare (last visited Apr. 20, 2023).

[2] "Medicaid provides health coverage to . . . eligible low-income adults, children, pregnant women, elderly adults and people with disabilities. Medicaid is administered by states, according to federal requirements." *See Medicaid*, Medicaid.gov, https://www.medicaid.gov/medicaid/inde x.html (last visited Apr. 20, 2023).

hospital, it produces separate Statements of Deficiencies for each survey. Once the investigated facility receives a Statement of Deficiencies—whether state or federal—the hospital must create and submit for approval a Plan of Correction to address the assessed violations. *See* 42 C.F.R. § 488.424; Cal. Health & Safety Code § 1280(b).

From July 13 to 17, 2012, Defendant Shirley Campbell—then a Health Facilities Evaluator Manager I for CDPH, now retired—along with another CDPH employee, now deceased, conducted an onsite investigation of the Hospital on behalf of the Centers for Medicare & Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services.[3] Defendant Campbell interviewed Dr. Chaudhry as part of this federal investigation. Here too, Defendant Lopez of CDPH verified and supervised the federal investigation.

As a result of these hospital surveys, CDPH surveyors produced two Statements of Deficiencies: one on behalf of the state, and one on behalf of the federal entity.

On July 27, 2012, after receiving the preliminary federal findings from CMS, the President and Chief Executive Officer of the Hospital sent a letter requesting that Dr. Chaudhry immediately step down as Medical Director of Cardiac Surgery and Thoracic Services. On August 8, 2012, CMS transmitted the formal federal Statement of Deficiencies to the Hospital.

Dr. Chaudhry appeared before the Hospital's Medical Executive Committee on August 15, 2012, and on August

---

[3] *See About CMS*, CMS.gov, https://www.cms.gov/About-CMS/About-CMS (last visited Apr. 20, 2023).

21, he received a fourteen-day medical staff membership and clinical privileges suspension via letter from the President of the Hospital's Medical Staff.  This letter explained that after reviewing the findings of the outside peer reviewer, the Medical Executive Committee concluded the following:

- There is evidence that the patient [Perez] was unstable following the conclusion of surgery; . . .

- In leaving the [operating room] and the hospital, [Dr. Chaudhry] failed to designate another physician qualified to provide the necessary coverage or care for this patient;

- As a result of [Dr. Chaudhry's] failure, there was an untimely response to the patient's deteriorating condition;

  . . .

- [Dr. Chaudhry] ha[d] already been directed to remain in the [operating room] until the patient's chest is closed; and

- Therefore, a fourteen-day (14) medical staff membership and clinical privileges suspension is imposed and shall be served within three (3) months of August 16, 2012.

On August 23, 2012, the Hospital submitted to CMS its Plan of Correction—prepared by the Hospital's Risk Manager, Laura McComb—in response to the federal Statement of Deficiencies.  Thereafter, on January 28, 2013,

CDPH—specifically Defendant Campbell—transmitted the state Statement of Deficiencies to the Hospital. The Hospital submitted to CDPH its Plan of Correction—also prepared by McComb—in response to the state Statement of Deficiencies on February 14, 2013. Defendant Lopez reviewed and signed the Hospital's federal and state Plans of Correction.

On June 14, 2013, the Hospital declined to renew a Consultant Services Agreement with Dr. Chaudhry.

On October 10, 2013, CDPH published on its website the combined state Statement of Deficiencies and Plan of Correction. This state Statement of Deficiencies did not mention Dr. Chaudhry or any other individual by name, but it referred to Dr. Chaudhry as "CVS 1." Importantly, the October-published state Statement of Deficiencies "found" among other things, that: (1) "CVS 1 left the [operating room] at 11:45 a.m. PA 1[4] and MD 1[5] sutured the chest closed with metallic wire at approximately 12:00 p.m. and then left the [operating room]" (footnotes not in original); and (2) "CVS 1 left the open heart surgery on Patient 1 prior to closing of the chest and prior to stabilization in violation of hospital medical staff bylaws." Neither CDPH nor CMS made available to the general public the federal Statement of Deficiencies and Plan of Correction. Only the Hospital—and not Dr. Chaudhry—had a right to appeal the state Statement of Deficiencies to CDPH or the federal Statement of Deficiencies to CMS. *See* Cal. Health & Safety Code § 1280(c)(1); 42 C.F.R. § 488.331(a)(2).

---

[4] "PA 1" represents physician assistant Albakova.

[5] "MD 1" represents Dr. Dhillon.

On November 13, 2013, the Hospital declined to renew a Call Coverage Agreement with Valley Cardiac.

On December 23, 2013, after being alerted to the potential malfeasance of Dr. Chaudhry by Hospital employee James Robillard, the family of Perez filed a malpractice lawsuit against Dr. Chaudhry and others in Fresno County Superior Court. *See Arteaga v. Fresno Cmty. Reg'l Med. Ctr.*, No. 13CECG03906 (Cal. Super. Ct. filed Dec. 23, 2013) ("Perez Malpractice Case"). Robillard supervised Schreur, who was the perfusionist during the surgery, and asked Schreur to write up the events of the surgery within days of it taking place; Robillard learned of the events of the surgery from Schreur, and not from the CDPH investigation.

On November 25, 2014, more than a year after publication on CDPH's website, CDPH amended the state Statement of Deficiencies to account for certain discrepancies revealed by "information from [the Hospital's] risk manager interview and comparison with clinical hospital records." Specifically, the state Statement of Deficiencies was revised to "find" that CVS 1 (Dr. Chaudhry) left the operating room at 12:15 p.m. on the day of the Perez surgery.[6] The amended state Statement of Deficiencies, which was published on CDPH's website, retained statements that CVS 1 left an unqualified and

---

[6] Recall that the original state Statement of Deficiencies found that "CVS 1 left the [operating room] at 11:45 a.m. PA 1 and MD 1 sutured the chest closed with metallic wire at approximately 12:00 p.m. and then left the [operating room]." It is now a stipulated fact that Dr. Chaudhry did not leave the operating room before 12:15 p.m. on the day of the Perez surgery.

unsupervised staff in charge of the operating room while the patient was unstable.

Following publication of the state Statement of Deficiencies, the Medical Board of California began investigating Dr. Chaudhry.  In December 2014, the Medical Board of California determined that it would take no action against Dr. Chaudhry.  As a result, Dr. Chaudhry remains licensed to practice medicine in California.

Dr. Chaudhry performed his last surgery at the Hospital in January 2018.  By February 2018, Dr. Chaudhry had at least five other malpractice lawsuits pending against him in addition to the Perez Malpractice Case.  Per Dr. Chaudhry's own assessment, as a result of these lawsuits, his professional liability insurer, Norcal, terminated his policy. Although other companies remained willing to insure him, Dr. Chaudhry determined that he could not afford such policies.  In March 2018, a California jury awarded the Perez family damages in excess of $60 million against Dr. Chaudhry and the Hospital.

Dr. Chaudhry is no longer practicing medicine in the United States but continues to practice in his home country of Pakistan at a reduced income.

### B.  Procedural Background

Plaintiffs filed suit in Fresno County Superior Court, and Defendants timely removed to federal court.  Plaintiffs' Complaint asserts a two-count "stigma-plus" due process claim under § 1983 on the grounds that the state's "blatantly false report" deprived Plaintiffs of protected employment-related interests without the due process of law ensured by the Fourteenth Amendment of the United States Constitution.  Importantly, Plaintiffs' Complaint alleges that

it is only the *state* Statement of Deficiencies—and not the federal Statement of Deficiencies—that is the source of their claim.

Plaintiffs' first count against the Director of CDPH in his official capacity seeks declaratory and injunctive relief in the form of a court order requiring the Director to withdraw the state Statement of Deficiencies and replace it with a new report "vindicating Dr. Chaudhry[] and his medical group." Plaintiffs' second count against Defendants Lopez, Campbell, and Eric Creer[7]—in their personal capacities— seeks money damages for their roles in "falsifying [the] CDPH report, and then refusing to correct said report" in derogation of Plaintiffs' due process rights.

All Defendants filed a motion for summary judgment on the grounds that they are immune from liability.[8] United States Chief District Judge Lawrence J. O'Neill granted summary judgment to Defendant Creer and denied summary judgment to all other Defendants. This action was then assigned, pursuant to parties' consent, to Magistrate Judge Stanley A. Boone for all purposes, including trial and entry of final judgment.

After a five-day bench trial, the district court entered judgment in favor of Defendants on the grounds that Plaintiffs did not successfully prove several of the requisite elements of their "stigma-plus" due process claim under § 1983; accordingly, the district court dismissed Plaintiffs'

---

[7] Defendant Creer was, at all relevant times, the Public Records Coordinator at CDPH's Center for Healthcare Quality in Sacramento.

[8] "Government officials sued in their individual capacities under § 1983 may raise the affirmative defenses of qualified or absolute immunity." *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002).

action in its entirety on the merits with prejudice. In so ruling, the district court denied Plaintiffs' motion to admit certain prior testimony of McComb from the Perez Malpractice Case. Plaintiffs timely filed their notice of appeal.

## C. Legal Background

### 1. 42 U.S.C. § 1983

By the plain terms of § 1983, a cause of action will lie where a plaintiff proves that: (1) a person acting under color of State law; (2) subjects or causes to be subjected to deprivation; (3) a U.S. citizen or person in the jurisdiction of the United States; (4) of a right, privilege, or immunity secured by the Constitution and laws.[9] Only the second and fourth elements are contested in the case at bar.[10]

---

[9] We have at times described § 1983 claims as comprising "*two* essential elements." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (emphasis added); *see also Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994) ("To make out a cause of action under section 1983, [a plaintiff] must plead that (1) the defendants acting under color of state law (2) deprived [her] of rights secured by the Constitution or federal statutes." (second alteration in original)). Although this characterization may consolidate certain constituent showings, such framing is not inconsistent with—nor does it purport to eliminate—any of the statute's plain-term requirements that a plaintiff seeking relief under § 1983 must prove: (1) a person acting under color of State law; (2) subjects or causes to be subjected to deprivation; (3) a U.S. citizen or person in the jurisdiction of the United States; (4) of a right, privilege, or immunity secured by the Constitution and laws.

[10] Concerning the first element, it is an undisputed fact that "defendants were employees of California Department of Public Health and acting under color of State Law" "[a]t all relevant times," such that Plaintiffs

### a. Subjects or Causes to Be Subjected to Deprivation

"In a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). Such causation "can be established" either "by some kind of direct personal participation in the deprivation" or "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1044 (9th Cir. 1994) (quoting *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987)). "To meet [§ 1983's] causation requirement, the plaintiff must establish both causation-in-fact[11] and proximate causation."[12] *Harper*, 533

---

satisfy the "color of state law" requirement of their § 1983 claim without need for further proof or discussion.

Likewise, parties agree that "[t]he events which underlie this action occurred in the Eastern District of California, and in particular, Fresno County," such that Plaintiffs satisfy the third, jurisdictional requirement of their § 1983 claim without need for further proof or discussion.

[11] A defendant's "conduct is an actual cause," or cause-in-fact, "of [a plaintiff's] injury only if the injury would not have occurred 'but for' that conduct." *White v. Roper*, 901 F.2d 1501, 1505–06 (9th Cir. 1990) (citing W. Prosser & W. Keeton, *The Law of Torts* § 41, at 266 (5th ed. 1984)).

[12] A defendant's conduct is a "proximate cause" of a plaintiff's injury if "it was not just any cause, but one with a sufficient connection to the result." *Paroline v. United States*, 572 U.S. 434, 444 (2014). "Proximate cause is often explicated in terms of foreseeability," such that the proximate cause requirement "preclude[s] liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* at 445.

F.3d at 1026 (footnotes not in original).  "Without [such] caus[ation], there is no section 1983 liability."  *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).

### b.  Of a Right, Privilege, or Immunity Secured by the Constitution and Laws

Lodging a claim under § 1983 also requires Plaintiffs to show they were deprived of a right, privilege, or immunity secured by the Constitution and laws.  42 U.S.C. § 1983. Here, Plaintiffs anchor their § 1983 claim on alleged deprivations of procedural due process under the Fourteenth Amendment of the United States Constitution.[13]

### i.  "Stigma-Plus" Due Process Claims

Specifically, they contend that "[CDPH's] false report" caused them to lose protected employment-related property and liberty interests without due process of law.[14]  Although the Supreme Court has stated that damage to reputation— without more—is insufficient to implicate the Fourteenth

---

[13] The Due Process Clause of the Fourteenth Amendment establishes that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

Although the Due Process Clause "confers both procedural and substantive rights," *Armendariz v. Penman*, 75 F.3d 1311, 1318 (9th Cir. 1996) (en banc), Plaintiffs in the case at bar allege only violations of their procedural due process rights.

[14] We note that Plaintiffs' First Amended Complaint only *expressly* alleges deprivation of employment-related *property* interests, as the word "liberty" does not appear in the Complaint.  Nevertheless, the district court appears to have interpreted Plaintiffs' Complaint to encompass alleged deprivations of both property *and* liberty interests. Because Defendants' briefing before us also appears to accept that Plaintiffs have pled deprivations of both liberty and property interests, we likewise proceed on such a basis.

Amendment's Due Process Clause, *see Paul v. Davis*, 424 U.S. 693, 706 (1976), a "stigma-plus" due process claim may lie where reputational harm "[i]s accompanied by some additional deprivation of liberty or property," *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004) (citing *Paul*, 424 U.S. at 708–09).

To lodge such a "stigma-plus" due process claim, "a plaintiff must show": (1) "the public disclosure of a stigmatizing statement by the government;" (2) "the accuracy of which is contested;" (3) "*plus* the denial of 'some more tangible interest[] such as employment.'"[15]

---

[15] Although the parties do not appear to contest that causation is an essential element of a § 1983 claim, we note Plaintiffs' citation to our opinion in *Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006) and pause to clarify a potential ambiguity.

Quoting *Hart*, Plaintiffs assert "[a] constitutional claim may lie if the plaintiff 'was stigmatized in connection with the denial of a more tangible interest.'" Plaintiffs are quite correct that in *Hart* we stated "the 'stigma-plus' test . . . can be satisfied in two ways": "[f]irst, the plaintiff must show that the injury to his reputation was inflicted *in connection with* the deprivation of a federally protected right;" "[s]econd, the plaintiff must show that the injury to reputation *caused* the denial of a federally protected right." *Id.* at 1070 (emphasis in original).

At first glance, it may seem that this language—which suggests that proving causation is *but one* pathway to lodge a cognizable "stigma-plus" due process claim—is in tension with our further instruction that "[w]ithout . . . caus[ation], there is no section 1983 liability." *Van Ort*, 92 F.3d at 837. But such language is indeed consistent. *Hart* provides only that for the purpose of establishing a "stigma-plus" due process claim, the attendant "stigma" does not *itself* need to have caused the alleged deprivation of a protected right; however, whether the stigma caused or was merely incidental to the relevant deprivation, by the plain language of 42 U.S.C. § 1983, a person acting under color of state law

*Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (alterations in original) (quoting *Paul*, 424 U.S. at 701).

### 2. Summation: Elements of a "Stigma-Plus" Due Process Claim under § 1983

In short, to lodge a cause of action under § 1983, Plaintiffs must establish that Defendants, (1) acting under color of State law, (2) caused (3) Plaintiffs, as U.S. citizens or persons within the jurisdiction of the United States, (4) a deprivation of rights, privileges, or immunities secured by the Constitution and laws. And further, to prove a deprivation of rights under § 1983 pursuant to a "stigma-plus" due process claim, Plaintiffs must establish: (1) the public disclosure of a stigmatizing statement by a state actor; (2) the accuracy of which is contested; (3) plus the denial of some more tangible interest. Failure to establish any of these enumerated elements will defeat Plaintiffs' "stigma-plus" due process claim under § 1983.

## II.  STANDARD OF REVIEW

We review a district court's findings of fact following a bench trial for clear error, *see* Fed. R. Civ. P. 52(a)(6), and will reverse "only if the district court's findings are . . . illogical, implausible, or without support in inferences from the record." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 613 (9th Cir. 2020). We review a district court's conclusions of law *de novo*. *Yu v.*

must have caused—either directly or by setting in motion a series of acts—the alleged deprivation of a protected right.

Thus, to the extent there was any ambiguity, causation is an essential element of a § 1983 claim.

*Idaho State Univ.*, 15 F.4th 1236, 1242 (9th Cir. 2021).  And we review a district court's evidentiary rulings for abuse of discretion, meaning we will disturb a district court's ruling only if it is both "erroneous *and* prejudicial."  *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1127 (9th Cir. 2020) (emphasis in original) (quoting *Wagner v. County of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013)).

In § 1983 cases, we review a district court's assessments of actual and proximate cause for clear error.  *See Harper*, 533 F.3d at 1026 n.13.  Under this standard of review, "[i]f the district court's account of the evidence is *plausible* in light of the record viewed in its entirety, [we] may not reverse it."  *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (emphasis added).  Accordingly, even "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Id.* at 574.

## III.   DISCUSSION

The district court held that Plaintiffs did not successfully prove several of the required elements of a "stigma-plus" due process claim under § 1983 and, thus, dismissed Plaintiffs' action in its entirety.  Plaintiffs challenge before us each negative elemental finding of the district court as well as the court's decision to exclude certain prior testimony from the Perez Malpractice Case.   Even considering the excluded testimony arguendo, at a minimum, we sustain the district court's determination that Plaintiffs failed to establish the requisite causation element under § 1983.   As such, we affirm the district court's dismissal of Plaintiffs' action in its entirety and do not reach the other challenged elements.

### A. We Sustain the District Court's Finding That Plaintiffs Failed to Establish the Requisite Causation for a § 1983 Claim.

Plaintiffs must demonstrate that Defendants' conduct was both the actual and proximate cause of their claimed deprivation in order to state a cause of action under § 1983. *See Harper*, 533 F.3d at 1026. The district court assessed that "Plaintiffs ha[d] not demonstrated by a preponderance of the evidence that any . . . constitutional injury . . . would not have been effected *but for* the State . . . investigations and reports." (Emphasis not in original). Plaintiffs now ask us to hold that Defendants' conduct indeed caused their deprivations of protected interests in the form of their "financial ability to make a living," "stellar reputation," and "standing and associations in [the] community."[16] We examine each of Plaintiffs' alleged interest deprivations and consider whether the district court clearly erred in finding that Plaintiffs failed to establish these interests would not have been affected "but for" the state Statement of Deficiencies. Assessing no "clear error," *see id.* at 1026 n.13, we sustain the district court's negative causation finding.[17]

---

[16] As suggested above, because we sustain, *infra*, the district court's dispositive determination that Plaintiffs failed to establish the requisite causation element for a § 1983 claim, we need not—and do not—reach whether these purported interests indeed comprise protected liberty and/or property interests under the Fourteenth Amendment.

[17] We note that the parties raise several subsidiary questions under the umbrella of causation:

First is whether Defendants' conduct was sufficiently direct or intentional so as to afford Plaintiffs a due process right to notice and a

### 1. Plaintiffs Failed to Clearly Establish That They Would Not Have Lost Their "Financial Ability to Make a Living" but for the State Report.

We assess that Plaintiffs' alleged loss of "financial ability to make a living" manifested in two ways: (1) Plaintiffs' loss of positions and contracts with the Hospital; and (2) "the effective shutdown of [their] medical practice." Addressing each in turn, we are not "left with the definite and firm conviction" that the state report is the but-for cause of either. *Anderson*, 470 U.S. at 573 (internal quotation marks and citation omitted).

---

hearing. *See, e.g.*, *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 788–89, 789 n.22 (1980) (drawing a "distinction between government action that directly affects a citizen's legal rights"—which confers a due process right to notice and a hearing—and "action that is directed against a third party and affects the citizen only indirectly or incidentally"—which does not—while leaving open the possibility that "if the Government were acting against one person for the purpose of punishing or restraining another, the indirectly affected individual might have a constitutional right to some sort of hearing").

Second is whether Defendants were sufficiently involved in the creation of the state Statement of Deficiencies so as to be responsible for any injury flowing from it. *See, e.g.*, *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation.").

We hold, *infra*, that Plaintiffs have not clearly established that the state Statement of Deficiencies—which Plaintiffs identify as the overriding source of their injury—was indeed the "but for" cause. As such, we affirm dismissal of Plaintiffs' entire action for lack of actual causation, *see Harper*, 533 F.3d at 1026, without need to reach or resolve these subsidiary causation questions.

### a.  Plaintiffs' Loss of Positions and Contracts with the Hospital

After the Perez surgery, the Hospital:

- asked Dr. Chaudhry to step down as Medical Director of Cardiac Surgery and Thoracic Services;

- suspended Dr. Chaudhry's medical staff membership and clinical privileges for fourteen days;

- declined to renew a Consultant Services Agreement with Dr. Chaudhry; and

- declined to renew a Call Coverage Agreement with Valley Cardiac.

The district court held that Plaintiffs failed to demonstrate that Dr. Chaudhry would not have been removed from his position, or that either of the Plaintiffs would not have lost contracts or business, but for the publication of the state Statement of Deficiencies.  We conclude that "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* at 573–74.

First, it is established that the Hospital would have conducted its own investigation into the Perez surgery with or without the state's involvement.  The Hospital's Plan of Correction indicated that the Hospital began its internal investigation into the Perez surgery on April 2, 2012—the very same day that the operation occurred.  Second, it is undisputed that CDPH did not even receive the anonymous call about the Perez surgery—which launched the state

investigation—until April 11, 2012, more than a week after the Hospital began its investigation.

Moreover, the district court correctly noted that the Hospital's internal investigation yielded the same material conclusions as the state Statement of Deficiencies. For example, in a letter dated August 21, 2012—several months before CDPH's transmittal of the allegedly stigmatizing state Statement of Deficiencies to the Hospital, which occurred on January 28, 2013—the President of the Hospital's medical staff informed Dr. Chaudhry that:

> The Medical Executive Committee's [i]nvestigation [has] concluded the following:
>
> - There is evidence that the patient was unstable following the conclusion of surgery; . . .
>
> - In leaving the [operating room] and the hospital, you failed to designate another physician qualified to provide the necessary coverage or care for this patient;
>
> - As a result of your failure, there was an untimely response to the patient's deteriorating condition; . . .
>
> - You have already been directed to remain in the [operating room] until the patient's chest is closed; and
>
> - Therefore, a fourteen-day (14) medical staff membership and clinical privileges suspension is imposed and shall be served

within three (3) months of August 16, 2012.

The state Statement of Deficiencies similarly found that:

- "CVS 1 left the [operating room] prior to closure of the chest bones back together . . . [which] violated the hospital's Rules and Regulations under the Bylaws which do not permit the primary surgeon to leave the [operating room] prior to the patient being established as stable;"

- "CVS 1 left in-charge an individual not qualified to be left in charge;" and

- "Patient 1 suffered massive blood loss after CVS 1 left the [operating room] and subsequently suffered cardiac arrest," and when the patient coded at 12:55 p.m., CVS 1 "wasn't in and they had to do something. [A nurse] got (CVS 1) on the phone and got the phone to (PA 1's) ear . . . . He instructed (PA 1) how to . . . insert a tube . . . but she could not do it. (CVS 1) came in at 1:29 p.m. and adjusted the cannulas."

In light of these determinations by the Medical Executive Committee, and their similarity to those in the subsequently issued state Statement of Deficiencies, we cannot say the district court clearly erred in finding "it . . . plausible that these same findings and conclusions would have led to

further discipline, including removal of the directorship, and declining to renew contracts."**18**

---

[18] Plaintiffs argue this "chain of causation neatly leaves out the influence" that CDPH exerted to coerce the Hospital into disciplining Dr. Chaudhry. Correspondingly, Plaintiffs challenge the district court's exclusion of certain prior testimony of Laura McComb, which they maintain "reveals the intent of [Defendants] to make threats and inflict harsh punishment . . . against Dr. Chaudhry."

Even assuming arguendo the district court erred in excluding the identified prior McComb testimony, we conclude that any such error was nonprejudicial because the excluded testimony does not support—but rather contradicts—Plaintiffs' attendant arguments. *See Barranco*, 952 F.3d at 1127 (instructing that a reviewing court will not disturb a district court's evidentiary ruling unless it is both erroneous *and* prejudicial).

First, the excluded testimony expressly refutes Plaintiffs' position that CDPH sought "harsher discipline visited on Dr. Chaudhry" through its rejection of multiple Plans of Correction proffered by the Hospital:

> Q. . . . [W]hat was the primary complaint that [Defendant] Campbell voiced to you about the first plan of correction that was rejected?
>
> A. The primary complaints dealt with specificity of the education, listing it out, and the specificity of what occurred in the disciplinary measures for Dr. Chaudhry.
>
> Q. And so is it correct that the State wanted you—the State is telling you that they want harsher discipline visited on Dr. Chaudhry in this plan of correction; is that right?
>
> A. No. They wanted it specified clearly.

Moreover, quite apart from showing "willful refusal to correct [mis]statements" indicative of Defendants' ulterior motives, McComb's prior testimony suggests there was nothing "unusual" about Defendants

### b. The Effective Shutdown of Plaintiffs' Medical Practice

Plaintiffs further dispute the district court's conclusion that Plaintiffs did "not demonstrate[]" that they would not have "lost . . . business but for the publication of the State [report]." Plaintiffs maintain that "the false accusations" in the state Statement of Deficiencies caused Dr. Chaudhry to be "run out of town on a rail," such that Plaintiffs could no longer maintain their once "thriving medical practice." Accounting for certain concurrent developments identified by the district court, we cannot say the district court clearly erred in holding that the state report was not the but-for cause of the "effective shutdown of [Plaintiffs'] medical practice."

We begin by noting a few key facts concerning the end of Plaintiffs' U.S. practice: First, Dr. Chaudhry is not—and has never—been barred from practicing medicine in California, as the state Medical Board declined to take action against him in December 2014. Second, Dr. Chaudhry is not even barred from practicing medicine at the Hospital, as—by his own account—he performed a case at the Hospital in January 2018. Critically, however, Dr. Chaudhry no longer

---

declining to make certain requested amendments to the state Statement of Deficiencies.

In short, where the prior McComb testimony is not the "smoking gun" Plaintiffs represent it to be, we decline to disturb the district court's exclusion of it. There is no support for Plaintiffs' attendant suggestion that the excluded McComb testimony establishes that the Hospital would not have disciplined Dr. Chaudhry or discontinued certain contracts with Plaintiffs but for the influence or coercion of Defendants.

has professional liability insurance, and—as he himself acknowledges—he cannot practice without it:

> [DEFENDANTS' COUNSEL]: You said you lost your ability to obtain malpractice insurance in . . . 2018?
>
> [DR. CHAUDHRY]: . . . [M]y last case at [the Hospital] is January of 2018. *You cannot practice unless you have malpractice.* After that, Norcal dropped [me] because it was costing them too much. Then I checked with other insurances. They were willing to give me insurance, but the cost was too high.

(Emphasis added). Equally critically, Dr. Chaudhry himself offers that his insurer dropped him *because of* the multiple malpractice lawsuits against him:

> [DEFENDANTS' COUNSEL]: . . . Isn't it true that by February 2018, when the cost of malpractice insurance was so high that you could no longer afford it, *you had at least five other malpractice lawsuits against you* in addition to the Perez case?
>
> [DR. CHAUDHRY]: *Correct. And that's why Norcal dropped it* because it was costing them too much.

(Emphasis added).

Accordingly, where—as Dr. Chaudhry concedes—he could not continue to practice medicine without malpractice insurance, and where—as again, Dr. Chaudhry concedes—his insurer dropped him due to the malpractice lawsuits

against him, the key question is whether the state Statement of Deficiencies caused the malpractice lawsuits. If not, Plaintiffs' assertion that the state report was the but-for cause of the end of Dr. Chaudhry's U.S. medical practice cannot stand. Thus, in order to test this causal relationship, the district court asked:

1. Would Perez's family and/or estate not have pursued legal action but for the CDPH investigation and report?

2. Would the Perez lawsuit not have moved forward but for the CDPH investigation and report?

The district court concluded that each of these developments would indeed have occurred in the absence of the state's involvement, and we deem its assessment "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 573–74.

To the first question, it is an undisputed fact that another Hospital employee, James Robillard—and not any government report—first alerted the Perez family to the potential malfeasance of Dr. Chaudhry during the April 2, 2012 surgery:

> [DEFENDANTS' COUNSEL]: . . . [T]he Perez family learned of … what had transpired in the operating room on April 2nd, 2012 not from the state report that was published, but from Mr. Robillard.
>
> [THE COURT]: So stipulated?
>
> [PLAINTIFFS' COUNSEL]: It's stipulated.

In turn, Robillard learned what transpired during the Perez surgery from the perfusionist, Schreur, and not from any government report. Thus, it is certainly plausible that the Perez family and/or estate would have pursued legal action against Dr. Chaudhry with or without the state Statement of Deficiencies.

Having accepted that the Perez family and/or estate plausibly would have pursued legal action in the absence of the state Statement of Deficiencies, we next accept as plausible that at least the Perez lawsuit would have moved forward without the state report. Pursuant to a request by Robillard, Schreur—a percipient witness in the operating room during the Perez operation—reduced to writing his largely contemporaneous account of the events of the surgery, which included Schreur's opinion that Dr. Chaudhry committed "gross negligence" that "need[ed] to be thoroughly investigated." Moreover, trial testimony from arguably the key percipient witness to the Perez operation, PA Albakova, corroborated that Dr. Chaudhry left the operating room while the patient's chest was still open:

> Q. Did you see Dr. Chaudhry exit the OR?
>
> A. Yeah, I saw him, yes.
>
> . . .
>
> Q. And then you proceeded to place the chest tubes?
>
> A. Yes.
>
> Q. And then you wired the sternum?
>
> A. Yes.

Q. And then you and Dr. Dhillon closed the—
several layers of skin?

A. Yes.

Lastly, the aforementioned August 21, 2012 letter from the Hospital's Medical Executive Committee—which incorporated the findings of an independent peer reviewer— concluded that Dr. Chaudhry's departure from the operating room was premature and in violation of hospital policies, as well as ascribed blame to Dr. Chaudhry for the unfortunate outcome of the surgery.

Thus, in light of the record evidence, we deem it entirely plausible that the Perez lawsuit would have moved forward without the fact of the state report. Moreover, we deem it plausible—in light of the same record evidence—that the Perez family could have secured a judgment against Dr. Chaudhry in said lawsuit without the state Statement of Deficiencies.[19]

In sum, Dr. Chaudhry submits that his medical malpractice insurer dropped him as a result of the several lawsuits against him. We have just accepted as plausible the subsidiary points that at least the Perez Malpractice Case could have proceeded and resulted in a judgment against Dr. Chaudhry even in the absence of the state report. It is therefore correspondingly plausible that Dr. Chaudhry's insurer would have dropped him, and that alternative medical insurance proved prohibitively expensive, even in the absence of the state report. Thus, where Dr. Chaudhry

---

[19] Recall the parties stipulated that the jury in the Perez Malpractice Case awarded damages against Dr. Chaudhry and the hospital in excess of $60 million.

himself acknowledges that he could not continue to practice medicine in the United States without medical liability insurance, we cannot say that the district court clearly erred in assessing that the state report was not the but-for cause of "the effective shutdown of [Plaintiffs'] medical practice."

### c.  Summation: Plaintiffs' "Financial Ability to Make a Living"

Because we sustain as "plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 573–74, the district court's findings that the state Statement of Deficiencies was not the but-for cause of either Plaintiffs' loss of positions and contracts with the Hospital or "the effective shutdown of [their] medical practice," we are not persuaded by Plaintiffs' contention that the state report clearly caused them to lose their "financial ability to make a living."

### 3.  Plaintiffs Failed to Clearly Establish That They Would Not Have Lost Their "Stellar Reputation" and "Standing and Associations in Their Community" but for the State Report.

Finally, we briefly consider and deem unpersuasive Plaintiffs' suggestion that the district court clearly erred in holding they "failed to demonstrate that Dr. Chaudhry's reputation[] or standing in the . . . medical community at large would not have been [a]ffected but for the State [report]."  Plaintiffs submit to us that "after the false accusations were spread to the medical community" via the state Statement of Deficiencies, Dr. Chaudhry's "referrals completely dried up."  But where we have already accepted as plausible that at least the Perez Malpractice Case would have proceeded in the absence of the state report, we cannot

say that it was clearly "the actions of the Defendants"—and not this highly publicized lawsuit—that, in Plaintiffs' words, "demolished" their reputation and caused them a "massive decline in referrals."

### 4. Causation Conclusion

In short, the district court assessed that "the tragic events surrounding Perez's surgery" and Dr. Chaudhry's violations of certain hospital policies—and not the ostensibly stigmatizing state Statement of Deficiencies—were the causes of Plaintiffs' alleged deprivations of their "financial ability to make a living," "stellar reputation," and "standing and associations in [the] community." Far from "le[aving us] with the definite and firm conviction that a mistake has been committed," *id.* at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)), the district court's negative causation finding is plausible in light of record evidence establishing, *inter alia*: the timing and conclusions of the Hospital's internal investigations; the independent actions of Hospital employee Robillard to alert the Perez family to potential malfeasance by Dr. Chaudhry; the Perez family and estate's pursuit of legal action; the accounts of key percipient witnesses to the Perez surgery as part of the Perez Malpractice Case; and the sizable malpractice judgment awarded against Dr. Chaudhry.

For the foregoing reasons, we sustain the district court's determination that Plaintiffs have failed to prove "[D]efendant[s'] conduct was the actionable cause of the claimed injury." *Harper*, 533 F.3d at 1026.

## B. We Do Not Reach the Remaining Claim Elements.

Because we sustain the district court's elemental determination that Plaintiffs failed to establish causation under § 1983, and because "there is no section 1983 liability" "[w]ithout . . . caus[ation]," *Van Ort*, 92 F.3d at 837, we affirm on causation grounds the district court's dismissal of Plaintiffs' § 1983 "stigma-plus" due process claim without reaching the remaining elements or arguments.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of Plaintiffs' action in its entirety.