**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL W. PARKER, as Personal Representative of the Estate of Curtis John Rookaird, | No.22-35695 |
| | D.C. No. 2:14-cv-00176-RAJ |
| *Plaintiff-Appellant*, | |
| v. | |
| BNSF RAILWAY COMPANY, a Delaware corporation, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted En Banc March 19, 2025
San Francisco, California

Filed May 15, 2025

Before: Mary H. Murguia, Chief Judge, and Susan P.
Graber, Kim McLane Wardlaw, John B. Owens, Danielle J.
Forrest, Jennifer Sung, Holly A. Thomas, Salvador
Mendoza, Jr., Roopali H. Desai, Anthony D. Johnstone and
Ana de Alba, Circuit Judges.

Opinion by Judge Graber

# SUMMARY[*]

## Federal Railroad Safety Act

The en banc court affirmed the district court's judgment after a bench trial in favor of BNSF Railway Co., the defendant in a retaliation action under the Federal Railroad Safety Act.

Conductor Curtis Rookaird alleged that BNSF fired him in retaliation for engaging in protected activity by testing the air brakes on railcars. After a bench trial on remand from this court, the district court concluded that Rookaird met his burden of proving, by a preponderance of the evidence, that the air-brake test was a contributing factor to the firing. The district court further found, however, that BNSF met its burden of proving that it would have fired Rookaird anyway.

The en banc court held that the district court applied the correct burden of proof from the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, or "AIR21," and permissibly determined that the air-brake test played a small role in BNSF's firing decision. Because even a small contribution suffices under the applicable lenient standard, Rookaird properly prevailed at this step of the analysis.

The en banc court held that under the AIR21 standard, if the plaintiff meets their initial burden, then the defendant faces a steep burden in proving, by clear and convincing evidence, the affirmative defense that it would have taken

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the same unfavorable personnel action in the absence of the protected behavior. The en banc court concluded that the district court correctly applied this legal standard. Reviewing for clear error, the en banc court affirmed the district court's finding that BNSF met the AIR21 standard's high bar and established the affirmative defense.

## COUNSEL

William G. Jungbauer (argued) and John D. Magnuson, Yaeger & Jungbauer Barristers PLC, Saint Paul, Minnesota; Cyle A. Cramer, Nichols Kaster PLLP, Minneapolis, Minnesota; for Plaintiff-Appellant.

David M. Morrell (argued), Jacqueline M. Holmes, and Michael Heckman, Jones Day, Washington, D.C.; Tim D. Wackerbarth, Callie A. Castillo, and Andrew G. Yates, Ballard Spahr LLP, Seattle, Washington; Shelby B. Smith, Jones Day, Pittsburgh, Pennsylvania; for Defendant-Appellee.

Robert B. Mitchell, K&L Gates LLP, Seattle, Washington; Kathryn D. Kirmayer and Charlie Kazemzadeh, Association of American Railroads, Washington, D.C.; for Amicus Curiae Association of American Railroads.

# OPINION

GRABER, Circuit Judge:

Curtis Rookaird worked as a conductor for Defendant BNSF Railway Company until early 2010, when BNSF fired him for his conduct on a single workday. BNSF concluded that Rookaird worked inefficiently; failed to sign his timesheet; dishonestly added to his timesheet time that he did not work; and insubordinately refused two separate instructions by a supervisor to leave the premises, instead staying on site and causing a heated argument with a coworker. Rookaird brought this action, alleging that BNSF retaliated against him in violation of the Federal Railroad Safety Act ("FRSA"). Rookaird argued that, during his shift, he engaged in activity protected by the FRSA by testing the air brakes on railcars and that BNSF fired him on account of those tests. The district court determined, after a bench trial, that BNSF had proved by clear and convincing evidence that it would have fired Rookaird anyway, even if he had not tested the air brakes. Because BNSF proved its affirmative defense, the court entered judgment for BNSF. We hold that the district court's decision was free of legal error and that the court did not clearly err in its factual findings. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

The district court made detailed factual findings following the bench trial. Parker v. BNSF Ry. Co., No. 2:14-cv-00176-RAJ, 2022 WL 897604 (W.D. Wash. Mar. 28, 2022). As we explain in this opinion, the record fully supports the district court's findings, and the court did not clearly err. We thus recount the facts as determined by the district court. See Yu v. Idaho State Univ., 15 F.4th 1236,

1241 (9th Cir. 2021) (noting that we must accept the district court's factual findings following a bench trial unless they are clearly erroneous).

On February 23, 2010, BNSF assigned Rookaird to work with engineer Peter Belanger and brakeman Matthew Webb. Parker, 2022 WL 897604, at *1. The shift began at 2:30 p.m. at the Swift depot in Blaine, Washington. Id. The primary task for the crew was to travel to the Cherry Point depot to service BNSF's customers. Id. But the crew was instructed first to travel to the Custer depot and to move 42 railcars onto storage tracks at that location. Id.

The crew traveled to Custer as instructed and began moving the cars onto storage tracks. Id. at *2. During that process, the crew performed an air-brake test, which took 20 to 40 minutes. Id. "During the air test, BNSF trainmaster Dan Fortt called the crewmembers on the radio and asked them why they were conducting the test. He said, 'I'm not from around here, and I don't know how you guys do anything. But from where I'm from, we don't have to air test the cars.'" Id. (citation omitted). "Despite his remarks, Mr. Fortt did not instruct the crew to stop the air test." Id.

At approximately 7:30 p.m., which was five hours into the shift, the crew had not yet moved all the cars onto the storage tracks. Id. When contacted by a supervisor, Rookaird stated that it would take one or two more hours to finish moving the cars. Id. The supervisor instructed the crew to tie the cars down to the main line and report back to the Swift depot. Id.

When the crew arrived at Swift, BNSF assistant superintendent Stuart Gordon instructed the crew to "tie up," or sign out for the day, and to go home. Id. Belanger and Webb signed out and left. Id. at *4. Rookaird failed to sign

his tie-up slip, and he inaccurately recorded the time as 8:30 p.m., instead of 8:02 p.m.  Id. at \*2.  Additionally, "instead of going home as instructed, Mr. Rookaird went to the lunch room and argued with another employee."  Id.  Gordon intervened and again told Rookaird to go home.  Id.  Rookaird "did not leave and instead continued to argue."  Id.  For a third time, Gordon instructed Rookaird to go home, and Rookaird complied.  Id. at \*3.

Following an investigation, BNSF fired Rookaird on March 19, 2010, "for four reasons:  he failed to work efficiently, he was dishonest when reporting his off-duty time, he failed to provide a signed FRSA tie-up slip, and he failed to comply with instructions when he was instructed to leave the property.  All four reasons stemmed from Mr. Rookaird's actions on February 23, 2010."  Id. (citation omitted).

> BNSF fired Mr. Rookaird in accordance with its Policy for Employee Performance and Accountability ("PEPA policy").  The PEPA policy outlined several types of rule violations and their consequences.  The most severe type of violation was a dismissible violation.  A single dismissible violation could result in the ultimate sanction of dismissal.  A list of single aggravated offenses that were considered dismissible was contained in Appendix C of the PEPA policy.  Under Appendix C of the PEPA policy, a single dismissible violation included gross dishonesty and insubordination.

BNSF terminated Mr. Rookaird for his gross dishonesty. Mr. Rookaird recorded his tie-up time as 8:30 P.M. when he, in fact, completed his tie-up slip 28 minutes earlier at 8:02 P.M. He also did not sign his tie-up slip. BNSF believed that this was improper and dishonest. It believed that this dishonesty was significant because it believed that maintaining proper tie-up slips was essential to complying with federal regulations. BNSF believed that Mr. Rookaird's failure to sign his FRSA tie-up timeslip and his inaccurate reporting of his tie-up time constituted gross dishonesty under Appendix C of the PEPA policy.

BNSF also terminated Mr. Rookaird for his insubordination. Mr. Gordon had the authority to instruct Mr. Rookaird to tie up and go home. Mr. Rookaird disobeyed Mr. Gordon's two commands to tie up and go home and instead began an argument with another employee. BNSF believed that Mr. Rookaird's refusal to comply with Mr. Gordon's instructions to tie up and go home constituted insubordination under Appendix C of the PEPA policy.

Finally, BNSF terminated Mr. Rookaird for his failure to work efficiently. On February 23, 2010, Mr. Rookaird and his crew were assigned several tasks, which included retrieving engines from Ferndale, moving 42 cars into storage at Custer, and servicing customers at Cherry Point. About

> five and a half hours into their shift, Mr.
> Rookaird and his crew had still not completed
> the moving of the cars into storage. BNSF
> believed that they were inefficient in
> accomplishing their tasks for that day and
> called them in accordingly. One reason for
> the delay was Mr. Rookaird's decision to
> conduct an air test, a test that BNSF believed
> to be unnecessary. BNSF concedes that Mr.
> Rookaird's conducting of the air test
> contributed to the crew's supposed
> inefficiency and delay.

Id. at *3–4 (citations, section headers, paragraph breaks, and paragraph numbers omitted).

In 2014, Rookaird brought this action against BNSF under the FRSA, alleging that BNSF fired him in retaliation for the protected activity of testing the air brakes. Rookaird had the burden of proving that BNSF fired him, at least in part, for protected activity. 49 U.S.C. §§ 20109(d)(2)(A)(i); 42121(b)(2)(B)(iii). BNSF nevertheless could defeat liability by showing, by clear and convincing evidence, that it would have fired Rookaird anyway, even if he had not engaged in protected activity. Id. § 42121(b)(2)(B)(iv).

The district court granted partial summary judgment to Rookaird on the issue whether the air-brake test contributed to his firing, but the court concluded that genuine issues of material fact remained as to whether air-brake testing was protected activity and whether BNSF met its affirmative defense. In 2016, a jury found in Rookaird's favor and awarded damages.

BNSF timely appealed, and we vacated the jury's verdict and remanded for further proceedings. Rookaird v. BNSF Ry. Co., 908 F.3d 451, 463 (9th Cir. 2018). We held that the district court erred by granting partial summary judgment to Rookaird on the issue whether the air-brake test contributed to BNSF's decision to fire him. Id. We expressed no view on whether a new trial was warranted on the affirmative defense. Id. at 463 n.8.

On remand, the parties stipulated to a bench trial, and the district court scheduled a trial on two substantive issues: (1) "whether Plaintiff could prove, by preponderance of the evidence, that Mr. Rookaird's refusal to stop performing the air test was a contributing factor in his termination"; and (2) "whether BNSF could prove, by clear and convincing evidence, that it would have fired Mr. Rookaird absent the air test." Parker, 2022 WL 897604, at *1. Before trial, Rookaird died, and the court substituted Paul Parker, personal representative of Rookaird's estate, as Plaintiff. Id. at *5.

The district court found in Plaintiff's favor on the first issue, whether Plaintiff met his burden of proving that the air-brake test was a contributing factor to the firing. Id. at *5–6. The court accurately explained that "[a] contributing factor 'may be quite modest,' and such a factor may 'play only a very small role' in the unfavorable personnel action." Id. at *5 (quoting Frost v. BNSF Ry. Co., 914 F.3d 1189, 1197 (9th Cir. 2019)) (brackets omitted). Applying that minimal standard, the court concluded that the air-brake test contributed to BNSF's decision:

> Because Mr. Rookaird was fired for his inefficiency and because the inefficiency was partly caused by the protected activity of

refusing to stop the air test, the Court concludes that the air test tended to affect in some way the outcome of BNSF's decision to fire Mr. Rookaird. And because the air test affected Mr. Rookaird's termination, it was a contributing factor in an unfavorable personnel action alleged in Mr. Rookaird's complaint.

Id. at *6 (citations, quotation marks, brackets, paragraph breaks, and paragraph numbers omitted).

But the district court found in BNSF's favor on the second issue, whether BNSF met its burden of proving, by clear and convincing evidence, that it would have fired Rookaird anyway, even if he had not tested the air brakes. Id. at *6–7. The court accurately explained that "[a]n employer can defeat a claim for unlawful retaliation if it can prove, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of the protected activity." Id. at *6 (citations and internal quotation mark omitted). The court also correctly described the burden of persuasion: "Clear and convincing evidence requires greater proof than preponderance of the evidence. To meet this higher standard, a party must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that the asserted factual contentions are highly probable.'" Id. (quoting OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., 897 F.3d 1008, 1020 (9th Cir. 2018)) (brackets and some internal quotation marks omitted).

Applying that standard, the court "conclude[d], by clear and convincing evidence, that absent the air test BNSF would have still fired Mr. Rookaird." Id.

> Mr. Rookaird was fired for many reasons unrelated to his inefficiency. He was fired for gross dishonesty, having failed to sign his FRSA tie-up timeslip and having falsely recorded his tie-up time. BNSF believed that this dishonesty was significant because of its federal reporting obligations and the potential fines it could have incurred for failing to meet those obligations. Separately, Mr. Rookaird was fired for insubordination, having twice disobeyed BNSF assistant superintendent Stuart Gordon's commands to tie-up and go home. Mr. Rookaird not only disobeyed Mr. Gordon's two commands but also started a heated argument with a coworker. Both gross dishonesty and insubordination were single, dismissible violations under the PEPA policy, which governed Mr. Rookaird's discipline.

> What is more, though the air test was a contributing factor in Mr. Rookaird's termination, the Court concludes that the test contributed very little. To start, the test did not even account for all of Mr. Rookaird's supposed inefficiency on February 23, 2010. Mr. Rookaird and his crew were working for about five-and-a-half hours before they were called in. Yet the air test only accounted for about 20 to 40 minutes of those five-and-a-

half hours. In addition, no BNSF officer instructed Mr. Rookaird to stop the air test. Though he doubted the air test's necessity, trainmaster Dan Fortt never instructed Mr. Rookaird to stop the air test. Given that there was no attempt to stop the air test, this is yet more evidence that the test played only a small part in BNSF's overall decision to fire Mr. Rookaird.

Further undermining the significance of the air test is its routine nature. At BNSF, air tests were conducted hundreds of times a day or more. And Mr. Rookaird conducted air tests several times in the weeks leading up to February 23, 2010 without incident. This also demonstrates that the test played only a small part in BNSF's overall decision to fire Mr. Rookaird.

Finally, Mr. Rookaird's two crew members, Mr. Webb and Mr. Belanger, performed the same air test as Mr. Rookaird but were not fired. They were not fired because, unlike Mr. Rookaird, they did not commit the single, dismissible violations that Mr. Rookaird committed. They were not insubordinate, and they did not improperly complete their tie-up timeslip. This further demonstrates that inefficiency and the air test—alone—would not have resulted in Mr. Rookaird's termination. It also demonstrates that, absent the air test, BNSF would have fired Mr. Rookaird anyway because of his gross dishonesty and insubordination.

In all, the Court forms the "abiding conviction" that even if Mr. Rookaird did not engage in the protected activity of refusing to stop the air test, BNSF would have still fired him for his gross dishonesty and insubordination. OTR Wheel Eng'g, 897 F.3d at 1020. Thus, the Court concludes that BNSF has successfully proved its defense by clear and convincing evidence.

Id. at *6–7 (paragraph breaks altered) (paragraph numbers and most citations omitted). Because BNSF proved its affirmative defense, the court concluded that "BNSF is not liable for unlawful retaliation under the FRSA." Id. at *7.

Plaintiff timely appeals. A majority of a three-judge panel vacated the district court's decision and remanded for further proceedings. Parker v. BNSF Ry. Co., 112 F.4th 687, 704 (9th Cir. 2024). Judge Graber dissented, stating that she would have affirmed the district court's decision. Id. at 704–13 (Graber, J., dissenting). A majority of active judges voted to rehear the case en banc. Parker v. BNSF Ry. Co., 122 F.4th 1072 (9th Cir. 2024) (order). The en banc court heard oral argument on March 19, 2025.

## DISCUSSION

The FRSA provides that a "railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to" specified categories of protected activity, such as refusing to violate a regulation related to railroad safety or testifying in certain railroad-related enforcement proceedings. 49 U.S.C. § 20109(a). Congress did not provide FRSA-specific burdens of proof for

retaliation claims; instead, Congress chose to incorporate the burdens of proof found in a different statutory scheme, the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), 49 U.S.C. § 42121(b).  See id. § 20109(d)(2)(A)(i) (providing that any action brought under the FRSA "shall be governed by the legal burdens of proof set forth in section 42121(b)").  Those burdens of proof are straightforward and well understood, in part because many statutory schemes use the same burdens.[1]

At trial, the plaintiff bears an initial burden to prove, by a preponderance of the evidence, that the protected activity was "a contributing factor in the unfavorable personnel action alleged in the complaint."          49 U.S.C. § 42121(b)(2)(B)(i).  If the plaintiff meets that burden, then the employer bears the burden to prove, "by clear and convincing evidence," that it "would have taken the same unfavorable personnel action in the absence of [the protected] behavior."  Id. § 42121(b)(2)(B)(ii).  That burden-shifting framework is, with respect to the overall burden

---

[1] Congress incorporated the AIR21 standards expressly in several other statutes, including the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(b)(2); the Surface Transportation Assistance Act, 49 U.S.C. § 31105(b); the Criminal Antitrust Anti-Retaliation Act of 2019, 15 U.S.C. § 7a-3(b)(2); the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6314, 134 Stat. 3388, 4601 (amending 31 U.S.C. § 5323(g)(3)(A)); and the Taxpayer First Act, 26 U.S.C. § 7623(d)(2)(B).  And Congress provided similar legal burdens in more statutes still, including the Motor Vehicle and Highway Safety Improvement Act of 2012, 49 U.S.C. § 30171(b)(2)(B); the FDA Food Safety Modernization Act, 21 U.S.C. § 399d(b)(2)(C); the Consumer Product Safety Improvement Act of 2008, 15 U.S.C. § 2087(b)(2)(B); the Energy Policy Act of 1992, 42 U.S.C. § 5851(b)(3); and the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1553(c)(1)(B), 123 Stat. 115, 299.

faced by a plaintiff, "more lenient than most." Murray v. UBS Sec., LLC, 601 U.S. 23, 35 (2024). "[B]y design," the framework is "not as protective of employers" as the framework adopted in many other employment statutes. Id. at 39.

### A. The Plaintiff's Initial Burden

The small burden that a plaintiff faces initially is one aspect of the lenient standard. The plaintiff need not prove retaliatory intent or motive. Id.; Coppinger-Martin v. Solis, 627 F.3d 745, 750 (9th Cir. 2010). Instead, the plaintiff must prove only that the protected activity was a "contributing factor" in the adverse employment decision. 49 U.S.C. § 42121(b)(2)(B)(i). "A 'contributing factor' includes 'any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" Rookaird, 908 F.3d at 461 (quoting Gunderson v. BNSF Ry. Co., 850 F.3d 962, 969 (8th Cir. 2017)). The plaintiff may meet this burden by showing that protected activity played some role in the employer's decision-making process. Frost, 914 F.3d at 1196–97. Indeed, even if the protected activity "played only a very small role in [the employer's] decision-making process," the plaintiff has met the initial burden.[2] Id. at 1197; see Murray, 601 U.S. at 37 (holding that the contributing-factor standard reflects the judgment that employers should not punish—"not even a little bit"— protected activity). Finally, the plaintiff must make that

---

[2] That minimal burden is fully consistent with the FRSA's legal rule that a plaintiff must prove that an adverse action was "due, in whole or in part, to" protected activity. 49 U.S.C. § 20109(a) (emphasis added). AIR21's burdens capture the notion that protected activity may not play any role, even a small one, in an adverse employment action. Nothing in the text of the FRSA alters the AIR21 burdens.

showing only by a preponderance of the evidence, Rookaird, 908 F.3d at 460, the default standard of proof in civil litigation, E.M.D. Sales, Inc. v. Carrera, 604 U.S. 45, 50 (2025).

But a minimal standard does not mean no standard at all. An employee may not prevail simply by showing engagement in protected activity. A plaintiff must persuade the factfinder that the protected activity played some role in the employer's decision. Frost, 914 F.3d at 1196–97. If the factfinder concludes that protected activity played no role whatsoever, then the plaintiff has not met the initial burden, and the plaintiff's FRSA claim must fail. Id.

The district court here correctly applied those legal rules in determining that the air-brake test contributed to BNSF's firing decision and that, accordingly, Plaintiff met his initial burden. The court announced the correct legal principles. Parker, 2022 WL 897604, at *5–6. And the court permissibly determined that the air-brake test played a role in BNSF's firing decision. Id. at *6. More specifically, the court found that (a) in assessing a worthy response for Rookaird's conduct on the day in question, BNSF's managers considered—along with other factors—the crew's inefficiency; and (b) "the crew's inefficiency was partly caused by Mr. Rookaird's decision to conduct an air test—a test that BNSF managers thought was unnecessary to conduct in the first place." Id. The court further concluded that the air-brake test had "contributed very little" to the firing decision. Id. at *7. But because even a small contribution suffices, Plaintiff prevailed at this step of the analysis. Id. at *5–6.

B.  The Defendant's Affirmative Defense

Another lenient aspect of the AIR21 standard is that the defendant faces a "steep burden" in proving the affirmative defense.  Araujo v. N.J. Transit Rail Operations, Inc., 708 F.3d 152, 162 (3d Cir. 2013).  To defeat liability, the employer must prove that it "would have taken the same unfavorable personnel action in the absence of [the protected] behavior."  49 U.S.C. § 42121(b)(2)(B)(ii).  And the employer must meet that burden "by clear and convincing evidence."  Id.  Both aspects—(1) what the employer must prove and (2) the legal standard—contribute to the high bar that an employer must clear in order to avoid liability.

Concerning the first aspect, the employer must prove that it "would have" taken the same personnel action had the employee not engaged in protected activity; proving simply that it "could have" taken the same personnel action does not suffice.  Speegle v. Stone & Webster Constr., Inc., ARB No. 13-074, 2014 WL 1870933, at *7 (U.S. Dep't of Lab. Admin. Rev. Bd. Apr. 25, 2014) (emphases added) (internal quotation marks omitted); see id. (explaining that "it is not enough to show that [the employee's] conduct provided a sufficient independent reason to suspend and fire him"; instead, the employer must show "that the employer would have done so").  "The right way to think about that kind of same-action causation analysis is to 'change one thing at a time and see if the outcome changes.'"  Murray, 601 U.S. at 38 (quoting Bostock v. Clayton County, 590 U.S. 644, 656 (2020)).  The relevant question here "is whether the employer would have 'retained an otherwise identical employee' who had not engaged in the protected activity."  Id. (quoting Bostock, 590 U.S. at 660) (brackets omitted).

In considering that inquiry, it is irrelevant that the plaintiff faced a minimal initial burden or that the statute prohibits even a small amount of discrimination. The FRSA's prohibition of discrimination "in whole or in part" has no effect on the affirmative defense. Congress chose both to prohibit even a small amount of discrimination and to allow an employer nevertheless to "defeat the claim" if it can show that it would have taken the same personnel action anyway. Frost, 914 F.3d at 1195.

Those two concepts coexist. In some cases, such as this one, an employer may consider, and cite, many reasons for an adverse action but would have made the same ultimate decision even if some of those reasons were absent. In other cases, the factfinder might conclude that each of the factors was critical to the employment decision; or that the protected activity was the only reason for the decision; or that the employer otherwise failed to prove that non-protected activity would have led the employer to the same decision. The key point is that the employer's affirmative defense, which arises only after the plaintiff has met the initial burden, is a distinct inquiry from the plaintiff's initial burden. The finding of a contributing factor is the necessary predicate for the affirmative defense, not some smoking gun that disproves or discredits the affirmative defense (especially where, as here, the district court found that the protected conduct contributed very little to the firing decision).

Nor does it matter how the plaintiff met the initial burden. Regardless of method—finding by a jury, ruling at summary judgment, concession, stipulation, estoppel, or some other reason—once the plaintiff meets the initial burden, that part of the case passes out of the picture, and

"[t]he burden then shifts to the employer" to prove the affirmative defense. Murray, 601 U.S. at 26.

Whether the employer would have taken the same action had the employee not engaged in protected activity is an intensely factual question and, depending on the facts, a wide range of evidence and factors may bear on the inquiry. Each case is different, and some factors that are critical in one case may shed little light in another case. No particular type of evidence is required. Rather than attempt to list all factors that may be relevant, we note simply that a factfinder must "holistically consider any and all relevant, admissible evidence." Brousil v. U.S. Dep't of Lab., Admin. Rev. Bd., 43 F.4th 808, 812 (7th Cir. 2022) (quoting Clem v. Comput. Scis. Corp., ARB No. 16-096, 2019 WL 4924119, at *12 n.8 (U.S. Dep't of Lab. Admin. Rev. Bd. Sept. 17, 2019)).

The applicable legal standard also contributes to the employer's high bar to defeating an FRSA claim. Whereas a plaintiff must meet a "preponderance of the evidence" standard, Rookaird, 908 F.3d at 454, the employer must prove the affirmative defense "by clear and convincing evidence," 49 U.S.C. § 42121(b)(2)(B)(ii). Proof by clear and convincing evidence is a "heightened" standard, E.M.D. Sales, 604 U.S. at 50, that falls "between a preponderance of the evidence and proof beyond a reasonable doubt," Addington v. Texas, 441 U.S. 418, 425 (1979). To meet the standard, the employer must "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.'" Florida v. Georgia, 592 U.S. 433, 439 (2021) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

We review for clear error whether the employer has met the affirmative defense.[3]   Under that standard, we reverse only if the district court's finding is "illogical, implausible, or without support in inferences from the record." Chaudhry v. Aragón, 68 F.4th 1161, 1171 (9th Cir. 2023) (citation and internal quotation mark omitted).   We must have a "definite and firm conviction that a mistake has been committed" to justify reversal. Long v. Sugai, 91 F.4th 1331, 1339 (9th Cir. 2024) (quoting Anderson v. Bessemer City, N.C., 470 U.S. 564, 573 (1985)) (internal quotation mark omitted).   In the specific context here, "we will upset the district court's finding of 'clear and convincing evidence' . . . only if we are firmly convinced that it was merely probable or unlikely that

---

[3] See Clairmont v. Sound Mental Health, 632 F.3d 1091, 1108 (9th Cir. 2011) (holding that whether an employer "would have reached the same adverse employment decision even in the absence of the employee's protected conduct" is "purely a question of fact" (brackets, citations, and internal quotation marks omitted)); see also Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 n.7 (3d Cir. 2019) (citing an earlier precedent for the rule that "whether the employer would have taken [an] action regardless" is a "question[] for the jury"); Koszola v. FDIC, 393 F.3d 1294, 1300 (D.C. Cir. 2005) (holding that the appellate court reviews "for clear error" "the district court's finding by clear and convincing evidence that the [employer] would have fired [the employee] regardless of any alleged protected activity"); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 584 (6th Cir. 2000) (holding that whether the employer "would have terminated [the employee] in the absence of his protected conduct . . . is a question of fact for the jury to decide"); Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir. 2000) (holding that whether the employer "would have fired [the employee] in the absence of discrimination" is a determination "best left in the hands of a jury"); Hall v. Marion Sch. Dist. No. 2, 31 F.3d 183, 193 (4th Cir. 1994) (holding that the determination "whether [the employee] would have been fired 'but for' her protected speech . . . is a factual one, and therefore, is not to be reversed absent clear error" (internal citation omitted)).

the [employer] would have fired [the employee] regardless of any protected [activity]."**4**  Koszola, 393 F.3d at 1300.

Applying those principles, we conclude that the district court correctly applied the legal standard and permissibly concluded that BNSF cleared the AIR21 standard's high bar.

The court committed no legal error.  It accurately recognized that BNSF was required to meet the affirmative defense "by clear and convincing evidence."  Parker, 2022 WL 897604, at *1, *5–7.  It also appreciated the proper legal standard, repeatedly framing the inquiry as whether BNSF "would have" fired Rookaird had he not tested the air brakes.  Id.

The court did not clearly err in finding that BNSF would have fired Rookaird anyway, had he not engaged in the protected activity of testing the air brakes.  The court found that BNSF fired Rookaird for several reasons.  Id. at *3.  The air-brake test related to only one of those reasons:  inefficient work.  Id. at *6.  But the air-brake test accounted for only twenty to forty minutes of the crew's five-and-a-half hours of inefficient work, no one told the crew to stop the air-brake test, and air-brake tests were routine.  Id. at *7.

The district court also found that BNSF fired Rookaird "for many reasons unrelated to his inefficiency."**5**  Id. at *6.

---

**4** Depending on who prevails before the factfinder, the deferential standard of review sometimes favors employees, Fresquez v. BNSF Ry. Co., 52 F.4th 1280, 1307–11 (10th Cir. 2022), and sometimes favors employers, Brousil, 43 F.4th at 812–13.

**5** Parker challenges the district court's finding that BNSF fired Rookaird for "gross dishonesty" and "insubordination" even though the description in Rookaird's termination letter did not use those exact words.  But the record fully supports the court's finding.  The letter specifically describes Rookaird's conduct and identifies the rules that

The court concluded that BNSF fired Rookaird because he lied on his timesheet and failed to sign it, violations of work rules that independently warranted dismissal. Id. at *6–7. The court credited the evidence that "dishonesty was significant [to BNSF] because of its federal reporting obligations and the potential fines it could have incurred for failing to meet those obligations." Id. at *6. Another reason why BNSF fired Rookaird, the court concluded, was that he twice disobeyed orders to leave the premises (causing a heated argument with a co-worker while he remained on site), which is also an independently dismissible violation. Id. at *6–7. Both the general manager who decided to fire Rookaird and the Human Resources employee who reviewed the record and concurred in the firing decision testified that the dishonesty and insubordination independently justified Rookaird's dismissal.

The court additionally observed that BNSF imposed a much lesser sanction on the other two members of Rookaird's crew. Id. at *7. Although those crewmembers, too, had worked inefficiently, they had not committed gross dishonesty or insubordination. Id.

Considering the record as a whole, the district court's analysis is logical, plausible, and supported by the evidence. The court logically determined that the other, strong reasons for the firing—gross dishonesty, insubordination, and inefficiency unrelated to air-brake testing—overwhelmed the relatively tiny role that the air-brake test played.

---

BNSF determined Rookaird had violated, including rules that use the terms "insubordination" and "gross dishonesty." The district court did not clearly err.

There was nothing improper about the district court's analysis in that regard.  As a matter of common sense, the role that the protected activity played in the firing decision bears directly on the credibility of an employer's explanation that it would have fired the employee in the absence of the protected activity.  For example, if the protected activity was the centerpiece of a firing decision, an employer will have a much harder time convincing a finder of fact that it would have fired the employee anyway.  Or, as here, if the protected activity played only a small role and the nonprotected conduct was egregious, then the employer's "we would have fired him anyway" explanation has more credibility.  Nothing in the law suggests that a factfinder must disregard the logically salient factor of the role that the protected activity played in the firing decision.

On the other hand, an employer does not necessarily escape liability merely because the protected activity played only a small role in the personnel action.  The factfinder must consider all relevant evidence in determining whether the employer has met its burden of proving, by clear and convincing evidence, that it would have taken the identical action in the absence of the protected activity.  Here, the district court reasonably weighed the evidence in reaching its conclusion that BNSF's explanation in this case was credible.

The district court also properly considered the discipline that Rookaird's crewmembers received.  Comparator evidence can be useful in assessing whether the employer would have fired the plaintiff anyway.  Araujo, 708 F.3d at 161.  The ideal comparator would be identical in all respects to the plaintiff except that the hypothetical coworker did not engage in the protected activity.  No real-world comparator will fit that bill, but understanding how the employer

disciplined similar conduct will nevertheless provide inferences useful to a factfinder. Here, Rookaird's crewmembers also engaged in the air-brake test and the inefficient work but, unlike Rookaird, they accurately and timely signed out and followed the instruction to go home. The lesser punishment for the other crewmembers supports the inference that—consistent with BNSF's written policies—BNSF viewed Rookaird's dishonesty and insubordination as the most egregious misconduct.

In sum, the air-brake test comprised only about ten percent of the time that Rookaird and his crewmates worked inefficiently (which is not an independently dismissible offense anyway); the test had nothing at all to do with Rookaird's dishonesty and insubordination (either of which is an independently dismissible offense); and Rookaird's crewmembers, who did not engage in dishonest or insubordinate conduct, received lesser punishment. In these circumstances, the district court reasonably found that BNSF would have fired Rookaird anyway, and we are not "firmly convinced that it was merely probable or unlikely that [BNSF] would have fired [Rookaird] regardless of any protected [activity]." Koszola, 393 F.3d at 1300.

We stress that none of the evidence discussed above or elsewhere in the record necessarily compelled the district court's conclusion regarding BNSF's affirmative defense. Another factfinder could have viewed the evidence differently, credited other testimony, or simply reached the opposite ultimate finding. Our task on appellate review is not to assess how we would rule as a factfinder; our task is

to review the district court's finding for clear error.  Because the court did not clearly err, we affirm.[6]

   **AFFIRMED.**

---

[6] Plaintiff also raises two evidentiary challenges.  We agree with, and adopt, the three-judge panel's rejection of those challenges. Parker, 112 F.4th at 703–04.